WO

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Kevin Roy,                                           )     No. CV-03-2150-PHX-SRB
                                                     )
          Plaintiff,                                 )     **ORDER**
                                                     )
vs.                                                  )
                                                     )
                                                     )
State of Arizona, Dora Schriro, Michael)
Linderman, John Sabbagh,                             )
                                                     )
          Defendants.                                )
                                                     )
_____)

          Plaintiff Kevin Roy, a prisoner in the custody of the Arizona Department of
Corrections ("ADOC"), commenced this action to challenge certain conditions of his
confinement; in particular, Plaintiff challenges under the Religious Land Use and
Institutionalized Persons Act ("RLUIPA") and the First Amendment's Free Exercise Clause
the ADOC's policies concerning inmate possession of books and religious items.  At issue
are the following: Plaintiff's Motion for Summary Judgment (Doc. 84); Defendants' Cross-
Motion for Summary Judgment (Doc. 90); and Defendants' Motion to Strike Plaintiff's
Supplemental Argument and Authorities (Doc. 105).

**I.       BACKGROUND**

          Plaintiff is currently incarcerated at the ADOC's Eyman Complex in Florence,
Arizona, a Security Level 3, controlled-movement prison facility. (Defs.' Statement of Facts
("DSOF"), ¶ 6.)  At all times relevant to Plaintiff's Complaint, Defendant Dora Schriro was

the Director of the ADOC, Defendant John Sabbagh was an ADOC senior prison chaplain, and Defendant Michael Linderman was the ADOC "Pastoral Administrator." (DSOF, ¶ 12.)[1]

### A.   The Number of Religious Items an Inmate May Possess[2]

ADOC inmates have the option of formally declaring a religious preference. That formal declaration enables them, among other things, to possess items approved for use in their chosen religion. (DSOF, Ex. A., ¶ 6.)

At the time Plaintiff initiated this action, ADOC policy permitted prisoners to possess only seven religious items, and those seven items were required to fit in a box designated solely for that purpose. (DSOF, Ex. A., ¶ 6.) The dimensions of that box were twelve inches by nine inches by four inches. (DSOF, Ex. A., ¶ 6.)

Plaintiff initiated this action, in part, to seek modification of this policy. In his Complaint, he seeks an order allowing him to possess as many religious items as can fit in the twelve by nine by four inch box. (First Am. Compl. at 7.)

During the pendency of this litigation, on September 12, 2005, the ADOC modified its policy concerning inmate possession of religious items. The new policy does not restrict the number of religious items each inmate may possess. Rather, inmates are permitted to possess as many religious items as can be fit in their religious-item boxes. (Defs.' Mot. to Strike Pl.'s Supplemental Argument and Authorities ("Defs.' Mot. to Strike"), Ex. A.) This box has been enlarged from its former size, and now measures seventeen and a half inches by ten and a quarter inches by eleven and a half inches. (Defs.' Mot. to Strike, Ex. A.)

---

[1]The other named defendant in this matter, Defendant Childs, has not been served with the summons and complaint in this matter and, therefore, pursuant to Federal Rule of Civil Procedure 4(m), Plaintiff's claims against Defendant Childs must be dismissed.

[2]For purposes of ADOC policy, a "book" is not included in the definition of a "religious item."

### B.    The Method for Obtaining Religious Items

The ADOC's policy concerning the specific religious items inmates are authorized to possess also appears to have changed.  ADOC Departmental Order ("D.O.") 909, Attachment A, which was effective as of November 1, 2002, stated that inmates could possess "religious items documented *as normally used* in the practice of the inmate's chosen religion, not posing a threat to the safe, secure and orderly operation of the institution."  (PSOF, Ex. 7 at 14 (emphasis added).)  It appears from the evidence before the Court that this policy, at least as it was applied to Plaintiff, was not enforced as written.  In determining whether to permit Plaintiff to possess particular religious items, a prison chaplain asked that Plaintiff provide documentation that the requested items were "tenet requirements" of his faith.  (PSOF, Ex. 15.  *See also* PSOF, Ex. 16 (a letter from Linderman to Plaintiff stating that "[t]he ADC has a desire to allow inmates the tools *necessary* to accomplish the practice of their chosen religion") (emphasis added)).  Indeed, in his First Amended Complaint, Plaintiff asks that the ADOC be forced to approve all religious items that are "motivated by a religious belief, not mandated by it."  (First. Am. Compl. at 7.)

At some point, this policy, at least as written, changed.  In its current form, it authorizes possession of religious items that are "consistent with the practices" of the inmate's declared religion.  (D.O. 909, Attachment A.)

An inmate who wishes to purchase particular religious items must first declare a religious preference, then submit a written request for the item to the chaplain.  (DSOF, Ex. A, ¶ 4.)  Upon verification of the inmate's religious preference, the chaplain determines whether the item should be approved or denied.  He may do this by consulting with a list of items that have already been approved for possession by other members of the inmate's chosen religion.  If the item does not appear on that list, the chaplain may do his own research as to the role the item plays in the religion, or he may ask the inmate to provide supporting documentation.  (DSOF, Ex. A., ¶ 4, 14.)  If an approved item is unavailable for purchase through the approved sources, "the Warden, in consultation with the Pastoral Activities Administrator, shall determine the method for obtaining the item."  (DSOF, Ex.

A., ¶ 5; Ex. B, ¶ 20.)  It is undisputed that the outside donation of religious items to inmates is not permitted.

Plaintiff's stated religious preference is Occultist/Esoteric Christian. (Pl.'s Statement of Facts ("PSOF"), ¶ 1.) On February 13, 2003, Plaintiff submitted a "Request for Approved Religious Items" form, asking permission to possess seven items: a Rosicrucian-symbol medallion, two sets of Tarot cards, a dream catcher, an altar cloth, incense, and an abalone shell. (DSOF, ¶ 5, Ex. A; PSOF, Ex. 13.)[3]  Plaintiff asserts that possession of these items is necessary to the proper observance of his religious faith.  (PSOF, Ex. 13.)

On February 28, 2003, Sabbagh wrote a letter to Plaintiff advising him that he needed to provide the prison chaplain's office "with a valid documentation from the Occultist/Esoteric Christian religious leadership.  The documentation should address the items which are the tenet requirements for this faith." (PSOF, Ex. 15.) That documentation came in the form of a letter, dated March 24, 2003, from Abbot Richard Christiansen of the "Brothers of Light, Religion of Ancient Ways, Western Mystery Tradition." (PSOF, Ex. 16.) The letter concerned "those practices and religious articles which customarily constitute part of the tenet requirements for those prisoners choosing to follow the 'Occult/Esoteric Christian' path as propagated by the Brothers of Light-Esoteric Christian Order." (PSOF, Ex. 16.)  The letter confirmed that the items requested by Plaintiff were central to the practice of Plaintiff's avowed religion.  (PSOF, Ex. 16.)  Appended to the letter was a "Selected Reading (Reference) List," alluding to what appear to be books about Plaintiff's religion. (PSOF, Ex. 16.)

---

[3]Plaintiff's request to possess religious items included only these specific items, and Plaintiff has only exhausted his administrative remedies with regard to his claim that he is not allowed to possess these specific items.  In his statement of facts in support of his cross-motion for summary judgment, Plaintiff asserts that he should also be allowed to possess items necessary for "ritual magic" and ceremony, including "ESP cards," pebbles, dice, mirrors, crystals or "other gazing devices" for "skyring," a means of "inducing a trance state that allows spiritual visions to come through."  (PSOF, ¶ 191.)

On April 9, 2003, Plaintiff met with Defendant Childs, a prison chaplain, who asked Plaintiff to submit additional documentation in support of his requested religious items. (PSOF, Ex. 18.)  According to Plaintiff, the meeting took place in the prison yard, and he offered to take Childs to the housing unit and show him the documentation, but Childs declined.  (PSOF, ¶ 8.)

About two weeks later, on April 28, 2003, Plaintiff wrote a letter to Linderman, asking what form the additional documentation should take. (PSOF, Ex. 18.) Linderman responded by letter on May 7, 2003, stating that, "[d]ocumentation should be in the form of printed material regarding aspects of the religion and the ritual tools used in the practice.  Letters from individuals are not considered appropriate documentation. . . .  A check of available resource information on Esoteric Christian has failed to verify the normal usage of the items you request."  (PSOF, Ex. 19.)

Plaintiff responded on May 19, 2003 in a letter to Sabbagh, stating that Plaintiff had the required "printed materials . . . in my personal possession," and that he would provide those materials at a meeting with prison chaplains.  (PSOF, Ex. 20.)  Plaintiff asked that Sabbagh "please schedule a meeting with me so that I may demonstrate to you via 'printed material,' the validity of my requests."  (PSOF, Ex. 20.)

The same day, Plaintiff also wrote a letter to Linderman, in which Plaintiff alludes to a conversation between "a member of my church" and Sabbagh, at which the church official offered to show Sabbagh the requested documentation, but, according to Plaintiff, Sabbagh replied only that he needed "more documentation."  (PSOF, Ex. 21.)  Plaintiff also made reference to the fact that he had requested a meeting with Sabbagh to show him the requested materials.  (PSOF, Ex. 21.)

According to Sabbagh, he responded to Plaintiff's May 19 letter by referring the matter to the "Unit Chaplain," who, according to Sabbagh, met with Plaintiff, but Plaintiff refused to provide any documentation. (PSOF, Ex. 14, at 4-5.) Plaintiff does not specifically deny that this meeting occurred, but he does state, for example, that, "Defendants refused to retrieve a copy of [Plaintiff's] book documentation."  (Pl.'s Mot. for Summ. J. at 9.)  Plaintiff

also points to a general absence of evidence that the meeting occurred.  For example, there is no evidence of any written communication between Sabbagh and the Unit Chaplain concerning the alleged meeting, nor did Defendants produce, among other things, the prison logs which, according to Plaintiff, would contain a record of him leaving his cell to meet with the Unit Chaplain.

Linderman responded to Plaintiff's letter on June 30, 2003, stating that, "Apparently from your letter, you still do not have documentation regarding the items you request and claim are normally used in your religion. . . . ADC cannot purchase books from a book list for each religion represented in our inmate population to verify an inmate's claim . . . . If you have possession of validating information other than the solicited letters you indicate, contact Chaplain Sabbagh so that he may secure a copy of it." (PSOF, Ex. 22.)  Linderman does not appear to have been aware of the alleged meeting between Plaintiff and the Unit Chaplain.

No meeting between Plaintiff and Sabbagh or Linderman occurred.  Plaintiff attributes this to their continual avoidance of a meeting with him.  (PSOF, ¶¶ 8, 31, 37, 68, 69.)  Plaintiff also attests that the task of providing the necessary information was further complicated by the fact that prison policy does not permit copies of religious materials to be made, or attachments to be included with Inmate Letters. (PSOF, ¶ 72, Ex. 25.)  In Plaintiff's view, he complied with the requisite procedure for arranging a meeting with a chaplain, which requires that the inmate "send an inmate letter to Eyman Complex Religious Department and a chaplain will set a time to meet with [the inmate]."  (PSOF, ¶ 76.)

Plaintiff's request for the seven religious items was denied, as, according to Defendants, he failed to provide them with the requisite documentation.

**C.    Inmate Possession of Religious Books**

Inmates may possess seven books in their cell at any given moment.  This restriction is attributable to the following: the size of the inmate's cell, the need to minimize friction between cellmates stemming from over-crowding of the cell by personal belongings, the fact that random searches become more time-consuming and complicated as possessions increase, and the need to comply with fire codes.  (DSOF, Ex. B., ¶¶ 11-15.)  Those books must be

obtained either from the inmate store or directly from the publisher, in order to minimize the introduction of contraband into the prison.  (DSOF, Ex. B., ¶¶ 15-17.)  Inmates may keep additional books in storage, and may access those books upon request.  (DSOF, Ex. B., ¶ 14.)

Plaintiff asserts that he requires more than seven books at one time because members of his faith "should acquire a firm knowledge of the fundamentals of biology, physics, math, history, and language," and because adherents of his faith "should be well-read and conversant with architecture, mythology, comparative religion, physiology and psychology."  (PSOF, ¶ 137.)  Plaintiff owns at least twenty religious books.  (DSOF, ¶ 20.)

**D.    Procedural History**

On November 3, 2003, Plaintiff filed a *pro se* civil rights complaint seeking declaratory and injunctive relief.  On May 19, 2004, the Court ordered Defendants to answer Plaintiff's claim that Defendants violated Plaintiff's right to the free exercise of his religion and that Defendants violated Plaintiff's rights pursuant to the RLUIPA.  Plaintiff amended his complaint on June 16, 2004.

The First Amended Complaint contains two counts.  The first count alleges that Defendants violated the First Amendment's Free Exercise Clause, the RLUIPA, and Arizona Revised Statute ("A.R.S.") § 41-1493.01 by denying Plaintiff the seven religious items that he has requested, by restricting the number of religious items an inmate may possess to seven, by requiring that he purchase religious items at the inmate store, rather than allowing those items to be donated by or purchased from "an outside source," and by approving for inmate possession only those religious items that are "mandated" by an inmate's chosen religion.  In the second count, Plaintiff alleges that his rights under the Free Exercise Clause, the RLUIPA, and A.R.S. § 41-1493.01 are violated by restricting the number of books he can possess in his cell at any given moment to seven.

On April 13, 2005, Plaintiff filed a motion for summary judgment, to which Defendants' responded on May 20, 2005 with a cross-motion for summary judgment.  On June 17, 2005, Plaintiff filed a notice of supplemental authorities in support of his motion for summary judgment, followed by, on October 6, 2005, a supplement to his motion for

1    summary judgment. Defendants filed a motion to strike the latter document on October 19,

2    2005.

3    **II.    LEGAL STANDARDS AND ANALYSIS**

4         **A.    Summary Judgment Standard**

5         The standard for granting summary judgment is set forth in Rule 56(c), Federal Rules

6    of Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no

7    genuine issues of material fact remain; and (2) after viewing the evidence most favorably to

8    the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.

9    Civ. P. 56 (2005); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53

10   (1986); *Eisenberg v. Insurance Co.,* 815 F.2d 1285, 1288-89 (9th Cir. 1987).

11        In considering a motion for summary judgment, the Court must regard as true the non-

12   moving party's evidence if it is supported by affidavits or other evidentiary material.

13   *Celotex,* 477 U.S. at 324, 106 S. Ct. at 2548; *Eisenberg,* 815 F.2d at 1289. However, the

14   non-moving party may not merely rest on its pleadings, he must produce some significant

15   probative evidence tending to contradict the moving party's allegations, thereby creating a

16   material question of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S. Ct.

17   2505, 2513-14 (1986).

18        A principal purpose of summary judgment is "to isolate and dispose of factually

19   unsupported claims." *Celotex*, 477 U.S. at 323-24, 106 S. Ct. at 2553. Summary judgment

20   is appropriate against a party who "fails to make a showing sufficient to establish the

21   existence of an element essential to that party's case, and on which that party will bear the

22   burden of proof at trial." *Id.*, 477 U.S. at 322, 106 S. Ct. at 2552; *see also Citadel Holding*

23   *Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994). The pleadings of a pro se litigant must be

24   liberally construed, however, pro se litigants are bound by the rules of procedure. *See United*

25   *States v. Seesting*, 234 F.3d 456, 462 (9th Cir. 2000); *Ghazali v. Moran*, 46 F.3d 52, 54 (9th

26   Cir. 1995). To defeat a defendant's motion for summary judgment a pro se plaintiff cannot

27   rely solely on his allegations but must support his claims by presenting significant and

28   probative evidence. *Franklin v. Murphy*, 745 F.3d 1221, 1235 (9th Cir. 1984).

**B.     Possession of Religious Items**

**1.     Mootness**

Defendants argue that in light of the ADOC's new policy concerning the number of religious items an inmate may possess, this aspect of Plaintiff's Complaint is now moot. (Defs.' Mot. to Strike, at 2-3.)  In particular, Defendants argue that because the new policy essentially provides Plaintiff with even more than that which his Complaint seeks, this portion of his Complaint has become moot.

Plaintiff responds that Defendants' contention, even assuming it is true, applies only to the number of religious items Plaintiff may possess, and does not address the other aspects of Plaintiff's claim, which include the allegedly wrongful denial of the particular seven items that Plaintiff requested, Defendants' refusal to allow the donation of religious items, and the requirement that Plaintiff purchase only those items sold in the inmate store.  (Pl.'s Resp. to Mot. to Strike, at 3.)  With regard to the number of religious items an inmate may possess, Plaintiff argues that the new policy does not moot his claim, as, according to Plaintiff, "a claim does not become moot merely because policy changes are undertaken under pressure of litigation."  (Pl.'s Resp. to Mot. to Strike, at 4, citing *Gluth v. Kangas,* 951 F.2d 1504, 1507 (9th Cir. 1991).)

Plaintiff is correct that the new policy does not render moot the entirety of his Complaint with regard to religious items.  Plaintiff applied for, and was denied, permission to possess seven specific religious items.  The propriety of that denial is one of the subjects of this lawsuit.  That Plaintiff may now be permitted to possess additional items beyond those seven already denied to him has no effect on whether the original seven items were properly denied to him.

The new policy does, however, render moot the aspect of Plaintiff's claim concerning the restriction on the number of religious items each inmate may possess.  A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Clark v. City of Lakewood,* 259 F.3d 996, 1011 (9th Cir. 2001) (quoting *City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S. Ct. 1382, 1390 (2000)).  These

- 9 -

criteria are satisfied when "it can be said with assurance that there is no reasonable expectation . . . that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles County v. Davis,* 440 U.S. 625, 630, 99 S. Ct. 1337, 1383 (1979) (citations, quotations and some punctuation omitted).

Plaintiff sought an order allowing him to possess as many religious items as could be fit in a twelve by nine by four inch box. (First Am. Compl. at 7.)  The new policy grants Plaintiff his wish, and more.  Under the new policy, Plaintiff may possess as many approved religious items as can fit in a seventeen and a half by ten and a quarter by eleven and a half inch box. (Defs.' Mot. to Strike, Ex. A.)

Plaintiff's reliance on the rule that voluntary cessation of allegedly illegal conduct does not make a case moot is unavailing.  Where "the possibility of recurrence of the challenged conduct is only a speculative contingency," *Burbank v. Twomey,* 520 F.2d 744, 748 (7th Cir. 1975), the case must still be dismissed as moot.  The Court agrees with Defendants that any suggestion that the ADOC will revert to the old policy once the threat of litigation has been removed is but a "speculative contingency."  *See id.*; *Vieira v. Woodford,* 2002 WL 1226852, *2 (N.D. Cal. May 30, 2002) (dismissing inmate's claim as moot where prisoner sought modification of a particular prison guideline and, during pendency of litigation, prison policy was so modified, and there was no indication that prison would revert to prior policy).  *See, e.g., McCarthy v. Ozark Sch. Dist.,* 359 F.3d 1029, 1036 (8th Cir. 2004) ("A speculative possibility is not a basis for retaining jurisdiction over a moot case.").  *Cf. Iron Arrow Honor Soc. v. Heckler,* 464 U.S. 67, 72, 104 S. Ct. 373, 375-76 (1983) (concluding that, where the defendant university had publicly announced a policy change, there was no reasonable likelihood that the defendant would return to the challenged policy).

In sum, Plaintiff's claim is moot with respect to his ability to possess more than seven religious items.  His claim is not moot, however, with respect to the other aspects of his claim concerning access to religious items.

## 2.    RLUIPA

RLUIPA, codified at 42 U.S.C. §§ 2000cc to 2000cc-5 (2003 & Supp. 2005), provides, in relevant part, that, "No government shall impose or implement a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers a "compelling governmental interest . . . [by] the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  The statute defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

These provisions of RLUIPA were recently upheld by the United States Supreme Court, which noted that RLUIPA should not be read "to elevate accommodation of religious observances over an institution's need to maintain order and safety. . . .  An accommodation must be measured so that it does not override other significant interests."  *Cutter v. Wilkinson*, 125 S. Ct. 2113, 2122-23 (2005).

Plaintiff contends that the ban on donations of religious items, the requirement that all religious items be purchased from the inmate store, and the denial of the seven requested religious items violate his rights under RLUIPA.  Defendant responds that, as a matter of law, none of the policies at issue impose a "substantial burden" on Plaintiff's religious exercise.

Plaintiff bears the responsibility of making a prima facie showing that the restriction placed upon his religious expression constitutes a "substantial burden." 42 U.S.C. § 2000cc-2(b); *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir. 2005).  Should Plaintiff make this prima facie showing, the burden shifts to Defendants to show that the substantial burden is both "in furtherance of a compelling governmental interest," and "the least restrictive means" of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a); § 2000cc-2(b); *Warsoldier,* 418 F.3d at 995.  Congress has demanded that the courts construe these provisions of RLUIPA "in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g); *Warsoldier,* 418 F.3d at 995.

1    The first step in the analysis is whether the ADOC policies at issue place a substantial

2    burden on Plaintiff's ability to practice his religion.  A "burden" is "substantial" under

3    RLUIPA if it is "oppressive to a significantly great extent," or if it imposes a "significantly

4    great restriction or onus upon [religious] exercise."  *Warsoldier,* 418 F.3d at 994 (citing *San*

5    *Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir. 2004)).  The

6    Supreme Court has found a substantial burden "where the state . . . denies [an important

7    benefit] because of conduct mandated by religious belief, thereby putting substantial pressure

8    on an adherent to modify his behavior and violate his beliefs."  *Thomas Review Bd. of the*

9    *Ind. Employment Sec. Div.,* 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1436 (1981); *see also*

10   *Bryant*, 46 F.3d at 949 (interpreting the term "substantial burden" as used in the Religious

11   Freedom Restoration Act ("RFRA") of 1993, 42 U.S.C. § 2000bb, to include governmental

12   action which burdens an adherent's practice of his religion "by preventing him [] from

13   engaging in conduct or having a religious experience which the faith mandates.").

14                   **a.    Requirement That Items Be Purchased at the Inmate Store**

15   The Court turns first to the policy banning outside donation of religious items and

16   requiring that religious items be purchased in the inmate store.  This policy is far from a

17   substantial burden on Plaintiff's practice of his religion because it does not actually prevent

18   Plaintiff from practicing his religion; it simply dictates the methods by which Plaintiff and

19   other inmates may obtain desired religious items.  An inmate wishing to purchase an item

20   must purchase it from the inmate store if it is available there, and if not, must allow prison

21   officials to determine the appropriate method for obtaining the item.  (DSOF, Ex. A.)  While

22   it appears that Plaintiff desires the ability to simply obtain religious items from any source

23   he pleases through a manner of his choosing, RLUIPA does not mandate such flexibility.

24   *See Adkins v. Kaspar,* 393 F.3d 559, 570 (9th Cir. 2004) (noting that "a government action

25   or regulation does not rise to the level of a substantial burden on religious exercise if it

26   merely prevents the adherent from either enjoying some benefit that is not otherwise

27   generally available or acting in a way that is not otherwise generally allowed").  Accordingly,

28   this aspect of Plaintiff's Complaint fails as a matter of law.

1

### b.        Possession of Religious Items

2  Next, the Court looks to whether Defendants properly denied Plaintiff's request to

3  possess the seven religious items.  This issue can be broken into two parts:  first, whether the

4  ADOC administrative procedure for obtaining religious items is, in itself, substantially

5  burdensome, and second, whether the denial of the items, i.e., forcing Plaintiff to try to

6  practice his religion without those items, is substantially burdensome.

7  Turning to the first issue, Defendants argue that the procedure is not substantially

8  burdensome, as it simply requires inmates to provide documentation in support of their

9  requests, and the procedure only appeared burdensome to Plaintiff because he refused to

10  follow it - that is, he chose not to supply Defendants with proper documentation.

11  In response, Plaintiff contends that while the procedure as written may not have been

12  burdensome, it was Defendants' refusal to follow it that has legal implications.  In particular,

13  Plaintiff asserts that he was first asked for a letter from his "religious leadership," but when

14  he fulfilled that request by having Abbot Christiansen write a letter to Sabbagh, Plaintiff was

15  told that such letters were necessarily insufficient and that the documentation had to come

16  in the form of "printed material."  According to Plaintiff, he had such materials in his cell,

17  but despite numerous attempts to set up meetings with members of the prison chaplaincy,

18  they refused.  In other words, Defendants made it impossible for Plaintiff to comply with the

19  procedure.

20  The Court finds that there are questions of material fact as to whether the procedure,

21  as it was implemented by Defendants vis-à-vis Plaintiff's request for religious items, was

22  substantially burdensome.  First, Defendants should not have asked for documentation from

23  Plaintiff's "religious leadership" if they were not prepared to accept it.  Defendants claimed

24  that the letter from Abbot Christiansen was insufficient because "letters from individuals are

25  not considered as appropriate documentation."  (PSOF, Ex. 19.)  But if that was true,

26  Defendants should not have asked for "valid documentation from the Occultist/Esoteric

27  Christian leadership." (PSOF, Ex. 58.)  In their brief, Defendants contend that the letter from

28  Abbot Christiansen was also insufficient because "there was no mention of Occultist/Esoteric

1   Christian anywhere on the letterhead; the Abbot did not identify himself as an authority on

2   the Occultist/Esoteric Christian religion, [and] . . . [the letter] included no references or

3   citations or copies of authoritative works." (DSOF, at 4.)  The Court rejects Defendants'

4   arguments.  If Defendants wanted Plaintiff to provide documentation from religious

5   leadership that contained "references or citations or copies of authoritative works," their letter

6   to Plaintiff should have said as much.  If Defendants wanted the letter from Plaintiff's

7   "religious leadership" to identify the religion in the letterhead, they should have said so.  And

8   while Abbot Christiansen does not explicitly state that he is an authority on the

9   Occult/Esoteric Christian religion, it is not an unreasonable assumption that he is, given that

10  he purports to be an abbot at the Brothers of Light-Esoteric Christian Order.  While

11  Defendants may be concerned about the authenticity or veracity of letters from "religious

12  leadership," Defendants should not ask for such letters if they are not prepared to accept

13  them.

14         This contradiction in Defendants' policy is, by itself, insufficient to constitute a

15  substantial burden on Plaintiff's religious exercise, but it is probative on that issue.  As soon

16  as it was made clear to Plaintiff that Abbot Christiansen's letter was insufficient, Plaintiff

17  wrote numerous letters to Sabbagh and Linderman requesting a meeting to provide them with

18  the requested materials.  It appears that Plaintiff complied with ADOC policy as to how to

19  request such a  meeting, as he sent Inmate Letters to the Eyman Complex Religious

20  Department.  Following receipt of such letters, ADOC policy requires that "a chaplain will

21  set a time to meet with [the inmate]."  (PSOF, ¶ 76.)

22         Sabbagh and Linderman do not dispute that they never met with Plaintiff concerning

23  his religious items.  Sabbagh does state, in a response to a request for admissions, that "I

24  referred this matter to the Unit Chaplain, and instructed him to meet with you and obtain the

25  documentation.  The Unit Chaplain met with you and you failed or refused to provide any

26  documentation."  (PSOF, Ex. 14.)

27         Even assuming that Sabbagh's statement constitutes admissible evidence, there is a

28  question of fact as to whether that meeting occurred.  Plaintiff does not specifically deny that

this meeting occurred, but viewing all of the evidence that he submitted in the light most favorable to him, it is clear enough to the Court that Plaintiff disputes the occurrence of the meeting.  For example, Plaintiff states generally that "Defendants refused to retrieve a copy of [Plaintiff's] book documentation,"  (Pl.'s Mot. for Summ. J. at 9) and Plaintiff devotes considerable space in his statement of facts to pointing out the utter absence of evidence that the meeting occurred.  For example, contrary to prison policy, once an inmate requests a meeting with a prison chaplain, a chaplain will "set a time to meet with [the inmate]."  Yet there is no dispute that Plaintiff was not informed of the meeting prior to its alleged occurrence.  There is no evidence of any written communication between Sabbagh and the Unit Chaplain concerning the alleged meeting, nor did Defendants produce, among other things, the prison logs which, according to Plaintiff, would contain a record of him leaving his cell to meet with the Unit Chaplain.  Nor is there evidence from the "logs or records from the Meadows Unit Chaplaincy which reflect the date, time, location and details of the meeting between the Unit Chaplain and [Plaintiff] regarding the approval of [Plaintiff's] religious items." (PSOF, ¶ 98.)  Finally, the Unit Chaplain may have been Defendant Childs, (PSOF, Ex. 18) yet he did not submit an affidavit as to whether he ever met with Plaintiff at the request of Sabbagh, and whether, if that meeting did occur, Plaintiff refused to turn over the validating documentation.

Also weighing in Plaintiff's favor is the fact that while Defendants requested that Plaintiff transmit to them the required documentation, it appears that it would have been difficult for Plaintiff to do so.  ADOC policy does not permit the photocopying of religious items, (PSOF, ¶ 72) so Plaintiff would have had to attach the actual religious books to an inmate letter.  Given that ADOC policy generally bars attachments to Inmate Letters, except when requested by staff, Plaintiff's contention that he would have had considerable difficulty had he attempted to "attach" religious books to an Inmate Letter does not appear unreasonable.  While Linderman states in an affidavit that, "[t]he ADC policy restricting the copying of religious materials prohibits inmates from copying religious materials for

distribution to other inmates, not as attachments to correspondence to staff," (DSOF, Ex. A, ¶ 18) there is no such allowance in the actual Departmental Order.  (PSOF, Ex. 25.)

It is also worth noting that Defendants required of Plaintiff an illegally high standard of proof as to the role the requested religious items must play in his religion.  "In determining whether a prisoner's religious freedom is substantially burdened, . . . the question is not whether a particular practice is *required* by the prisoner's faith, but rather whether "the practices in question *are important* to the votaries of the religion." *Charles v. Verhagen,* 220 F. Supp. 2d 937, 948 (W.D. Wis. 2002) (quotations and citations omitted) (emphasis added). *See Cutter,* 125 S. Ct. at 2122-23.  This view is supported by the language of the statute, which defines "religious exercise" to include "*any* exercise of religion, *whether or not compelled by, or central to,* a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A) (emphasis added).

As written, the policy then-in effect required that the religious items be "normally used in the practice of the inmate's chosen religion." (PSOF, Ex. 7 at 14.)  While even this standard appears impermissibly high given RLUIPA's definition of "religious exercise," Defendants required Plaintiff to show that the religious items he requested were "necessary" to the practice of his religion, or were "tenet requirements" thereof.  (PSOF, Ex. 15, 16.)

The policy as applied, in effect, prohibits the possession of non-essential religious items.  An obvious assumption of this policy is that as long as a religious item is non-essential, the denial of that item to an inmate cannot be substantially burdensome.  That assumption is wrong, given the RLUIPA's definition of "religious exercise."

In sum, with regard to the issue of whether the procedure for obtaining religious items, as it was applied to Plaintiff, was substantially burdensome, the Court concludes that genuine issues of material fact remain.  On one hand, there is evidence that Plaintiff refused to provide the Unit Chaplain with the requested documentation at a meeting ordered by Sabbagh for that specific purpose.  On the other hand, Plaintiff appears to dispute the existence of that meeting, and other than Sabbagh's response to an interrogatory propounded by Plaintiff, there is no evidence that the meeting transpired.  There is other evidence in

1   Plaintiff's favor:  the fact that Defendants asked Plaintiff for a letter from his "religious

2   leadership" and then refused to accept it, and the fact that Defendants asked Plaintiff to

3   transmit the requisite documentation, when ADOC policy barred photocopying of religious

4   material.

5          The Court now turns to the issue of whether it would be a substantial burden to force

6   Plaintiff to practice his religion without the requested items.  The Court finds that there are

7   questions of fact as to this issue as well, as there is insufficient evidence in the record to

8   conclude as a matter of law that depriving Plaintiff of these items would substantially burden

9   his ability to practice his religion.

10         Even assuming that Defendants' above-described actions do constitute a substantial

11   burden on Plaintiff's ability to exercise his religion, Defendants may still be entitled to

12   summary judgment if they can show that the burden they imposed was the "least restrictive

13   means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2);

14   *Warsoldier,* 418 F.3d at 995.

15         This analysis is somewhat complicated by the fact that, as discussed above, the policy

16   concerning religious items does not appear to be problematic, only the way that the policy

17   was applied to Plaintiff.  Even so, the Court concludes that there are material issues of fact

18   concerning the compelling interest that motivated Defendants' action vis-a-vis Plaintiff, as

19   well as whether their actions were the least restrictive means of achieving those interests.[4]

20                    **3.       First Amendment - Free Exercise Clause**

21         Prison inmates "retain protections afforded by the First Amendment, including its

22   directive that no law shall prohibit the free exercise of religion."  *O'Lone v. Estate of*

23   *Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987) (citation omitted).  Prison

24   regulations that impinge on an inmate's constitutional rights will be upheld if they are

25

26         [4]Defendant also argues the applicable provisions of RLUIPA are unconstitutional, an
    argument that is foreclosed by the Supreme Court's decision in *Cutter.*  125 S. Ct. at
27   2113 (upholding the constitutionality of provisions of RLUIPA pertaining to
    institutionalized persons).
28

1   reasonably related to legitimate penological interests.  *Turner v. Safley*, 482 U.S. 78, 89, 107

2   S. Ct. 2254, 2261 (1987); *Henderson v. Terhune*, 379 F.3d 709, 712 (9th Cir. 2004).  *See*

3   *Haley v. R.J. Donovan Corr. Facility,* 152 Fed. Appx. 637, 638 (9th Cir. 2005) (noting that

4   *Turner* is the proper test to apply in a First Amendment Free Exercise claim). *Cf. Marria v.*

5   *Broaddus*, 200 F. Supp. 2d 280, 298 (S.D.N.Y. 2002) (distinguishing the "less demanding

6   First Amendment analysis" from that required by the RLUIPA).

7         In *Turner*, the Supreme Court provided four considerations to help determine whether

8   a challenged regulation is reasonably related to legitimate penological interests:

9           First, there must be a valid, rational connection between the prison

10          regulation and the legitimate governmental interest put forward to

11          justify it.  Second, whether there are alternative means of exercising

12          the right that remain open to prison inmates must be assessed.  Third,

13          the impact accommodation of the asserted constitutional right will

14          have on guards and other inmates, and on the allocation of prison

15          resources generally must be determined.  Fourth, the absence of ready

16          alternatives to the regulation must be explored. The existence of

17          obvious, easy alternatives may be evidence that the regulation is not

18          reasonable.

19  *Ward v. Walsh,* 1 F.3d 873, 876 (9th Cir. 1993) (citing *O'Lone,* 482 U.S. at 348, 107 S. Ct.

20  at 2401; *Turner,* 482 U.S. at 89, 107 S. Ct. at 2261) (some punctuation omitted)).

21        In the context of a free exercise claim, a plaintiff must establish that the defendant's

22  actions substantially burdened his practice of his religion by preventing him from engaging

23  in conduct mandated by his faith, i.e., conduct which is central to the religion's doctrine,

24  without any justification reasonably related to legitimate penological interests. *See Freeman*

25  *v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997) (citing *Turner,* 482 U.S. at 89, 107 S. Ct. at

26  2261-62); *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995); *Sutton v. Stewart*, 22 F. Supp.

27  2d 1097, 1101-02 (D. Ariz. 1998).

28

The Court concludes that there are material questions of fact concerning the aspects of Plaintiff's free exercise claim related to the denial of the seven requested religious items. First, while there is surely a legitimate penological interest in controlling which items an inmate may possess under the rubric of "religious items," there is no legitimate penological purpose for refusing to meet with an inmate so that he may provide requested documentation concerning his requested religious items. There is also no legitimate penological purpose for demanding that an inmate provide documentation from "religious leadership," then refusing to accept it. As there are questions of fact about some of these issues, this factor favors neither party.

Second, Plaintiff does appear to have alternative means available to practice his religion other than through the use of the requested items. He is served a diet in accordance with his religious beliefs, and he has the opportunity to meditate and to possess religious books. This factor appears to weigh in favor of Defendants, though not strongly so.

Third, it is unclear what impact accommodation of the asserted constitutional right will have on the guards, inmates and allocation of prison resources. Defendants point to the fact that allowing inmates to possess undocumented religious items would have negative effects on prison operation and security. Maybe so, but the effect of, for example, allowing the photocopying of religious materials so that they can be transmitted to prison chaplain members in order to satisfy requests for supplemental documentation is less certain. This factor favors neither party.

Fourth, the existence of ready alternatives is unknown to the Court. If a fact finder were to conclude that the meeting between the Unit Chaplain and Plaintiff never occurred, the obvious, easy solution to Plaintiff's concern would be to order a prison chaplain to meet with him to obtain the documentation, or to allow inmates to have religious materials photocopied when such materials are explicitly requested by members of the chaplaincy. Another obvious solution would be to refrain from asking inmates for letters from their religious leadership when such letters do not suffice on the issue of whether a particular item is appropriate for possession given the inmate's declared religion. However, as there are

questions of fact as to whether the meeting occurred between Plaintiff and the Unit Chaplain, this factor favors neither party.

It is clear from the discussion of the *Turner* factors that neither side is entitled to summary judgment on this issue. Both motions for summary judgment are therefore denied in this regard.

Next, the aspects of Plaintiff's free exercise claim concerning the prohibition on donations of religious items and the requirement that items be purchased in the inmate store can be decided at the summary judgment stage. These policies impose no burden on an inmate's ability to practice his religion, as they do not prohibit an inmate from possessing particular religious items; they simply prescribe the method by which inmates obtain religious items. The practice of controlling the sources from which inmates obtain their property serves the valid penological goal of limiting the amount of contraband that enters the prison.

### C.    Possession of Religious Books

#### 1.    RLUIPA

The issue is whether restricting inmates to possessing seven books in their cells at any given moment imposes a "substantial burden" on the inmates' ability to practice their religion. As a matter of law, the Court finds that there is no substantial burden. As discussed above, the policy does not limit the number of books that an inmate may own, or, as far as the Court is aware, keep in prison storage. The policy simply affects the number of books that may be in the possession of an inmate *in his cell* at any moment. An inmate who has completed study of a particular book can follow prison procedure for substituting that book for another book in prison storage. There is no dispute that Plaintiff himself owns twenty books, and he had made no contention that the process of having a book transferred from prison storage is substantially burdensome. Defendants are entitled to summary judgment on this point.

#### 2.    First Amendment - Free Exercise Clause

Plaintiff complains that the ADOC policy of permitting inmates to have only seven books at a time in their cells violates his right to freely exercise his religion under the First Amendment.  Plaintiff's contention fails for several reasons.

First, even assuming that the books Plaintiff seeks are mandated by his religion, the practice of limiting the number of books an inmate may keep in his cell at any given moment to seven does not impinge on Plaintiff's ability to practice his religion.  As discussed above, the policy does not limit the number of books inmates may keep in prison storage and access through proper procedure; the policy simply limits the number of books inmates may keep in their cell at one time.  (DSOF, Ex. B.)

Second, the restriction on the number of books an inmate may possess in his cell at any given moment clearly serves valid penological purposes.[5]  The overcrowding of cells with inmates' property would have a negative impact on security and safety: random searches of cells become more time-consuming, complex, and costly; friction between cellmates could increase as small cells become cluttered with property; and fire code compliance becomes more difficult.  (DSOF, Ex. B.)

No genuine issues of material fact remain on this issue, and summary judgment in Defendants' favor is therefore appropriate.

**D.    Miscellaneous**

Defendants argue that the action should be dismissed because they are entitled to qualified immunity.  This argument fails, as qualified immunity is not a defense to an action, like the present one, that does not seek monetary damages.  *Walker v. Gomez,* 370 F.3d 969 (9th Cir. 2004); *AFTC Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir. 1991).

---

[5]This is especially true where, as here, the prisoner seeks a veritable library full of books.  Plaintiff contends that his religion requires him to be well-versed in the following subjects: "music, geometry, psychology, anthropology, archaeology, languages, folk-lore, physiology, physics, philosophy, comparative religion, natural science, history, mathematics, mythology, biology and the Hebrew and Greek alphabets."  (Pl.'s Mot. for Summ. J. at 4-5.)

1    Defendants' motion to strike Plaintiff's supplemental argument and authorities in

2    support of his motion for summary judgment is denied.   The Court has given due

3    consideration to the issues raised in Plaintiff's supplemental papers.

4    Plaintiff also brings claims under provisions of the Arizona Constitution and under

5    A.R.S. § 41-1493.01, which is Arizona's version of RLUIPA.  Defendants argue that these

6    claims must be dismissed because Plaintiff failed to file the required statutory notice of claim

7    (DSOF, Ex. E), which, in Arizona, requires that:

8            Persons who have claims against a public entity or a public employee

9            shall file claims with the person or persons authorized to accept service

10           for the public entity or public employee as set forth in the Arizona rules

11           of civil procedure within one hundred eighty days after the cause of

12           action accrues. The claim shall contain facts sufficient to permit the

13           public entity or public employee to understand the basis upon which

14           liability is claimed. The claim shall also contain a specific amount for

15           which the claim can be settled and the facts supporting that amount.

16           Any claim which is not filed within one hundred eighty days after the

17           cause of action accrues is barred and no action may be maintained

18           thereon.

19   A.R.S. § 12-821.01.

20   Plaintiff does not dispute that he failed to file the requisite notice of claim, nor does

21   he dispute that his claims are entirely against public employees.  Instead, Plaintiff argues that

22   because he brought his claim in federal court, he is not required to file a notice of claim with

23   the state. (Pl.'s Reply in Supp. of Mot. for Summ. J. at 16.)  Plaintiff is mistaken, as federal

24   courts applying state laws are obligated to apply notice of claim provisions, where, as here,

25   such provisions are outcome determinative.  *Felder v. Casey,* 487 U.S. 131, 151, 108 S. Ct.

26   2302, 2313 (1988) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S. Ct. 817 (1938)).

27   Accordingly, all of Plaintiff's state law claims are dismissed.

28   **III.    CONCLUSION**

1        Plaintiff's motion for summary judgment is denied in its entirety.  Defendants' motion

2  for summary judgment is granted in part and denied in part.  With regard to the decision to

3  deny to Plaintiff the seven religious items that he requested, summary judgment is

4  inappropriate.  Summary judgment is also inappropriate on Defendants' qualified immunity

5  argument.  With regard to all other portions of Defendants' motion, they are entitled to

6  summary judgment.

7        **IT IS ORDERED** denying Plaintiff's Motion for Summary Judgment (Doc. 84).

8        **IT IS FURTHER ORDERED** granting in part and denying in part Defendants'

9  Cross-Motion for Summary Judgment (Doc. 90).

10        **IT IS FURTHER ORDERED** denying Defendants' Motion to Strike Plaintiff's

11  Supplemental Argument and Authorities (Doc. 105).

13        DATED this 13th day of January, 2006.

                                      Susan R. Bolton
                             United States District Judge